**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JOSEPH A. CRUM,

                Plaintiff,

  v.

DR. DAWN MARINI, Clinical Director;
BRADLEY R. CINK, Physician Assistant;
MILLER, Health Service Administrator; T.R.
CRAIG, Warden; SCOTT DODRILL,
Regional Director; HENRY J. SADOWSKI,
Regional Counsel; and UNITED STATES,

                Defendants.

No. 06-CV-513
(GLS/DRH)

---

**APPEARANCES:**

JOSEPH A. CRUM
Plaintiff Pro Se
No. 31353-037
Federal Correctional Center
Forest City - Medium
Post Office Box 3000
Forrest City, Arkansas 72336

HON. GLENN T. SUDDABY
United States Attorney for the
  Northern District of New York
James T. Foley U.S. Courthouse
445 Broadway
Room 218
Albany, New York 12207-2924

**OF COUNSEL:**

BARBARA D. COTTRELL, ESQ.
Assistant United States Attorney

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER** [1]

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Joseph A. Crum ("Crum"), an inmate in the custody of the United States Bureau of Prisons ("BOP"), brings this action against six individual BOP employees and the United States under the Federal Torts Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq. Docket No. 27.[2]  Presently pending is defendants' motion to dismiss the FTCA claim or for summary judgment pursuant to Fed. R. Civ. P. 12(b)(6) and 56.  Docket No. 28. Crum opposes the motion.  Docket No. 29.  For the reasons which follow, it is recommended that defendants' motion for summary judgment be granted.

### I. Background

The facts are related in the light most favorable to Crum as the non-moving party. See subsection II(A) infra.  Because the course of medical treatment received by Crum is at the core of his claim and defendants' motion, the record of that treatment is described herein in detail.

### A. Ray Brook

Crum was an inmate in the custody of the Federal Correctional Institution at Ray Brook, New York ("Ray Brook") from January 16, 2003 through August 5, 2005.  See Ward Decl. (Docket No. 18) at Ex. 1D.  During this time, Crum suffered "injuries [to his] lower back, shoulder, neck, cervical spine, and head pain . . . ."  Compl. at 4.  Crum contends that

---

[2]The complaint asserted claims for intentional torts against defendants under Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388 (1971), alleging that defendants violated Crum's constitutional rights.  Compl.  Those claims were dismissed and defendants were granted leave to re-move against Crum's claim under the FTCA.  Id.,

defendants were, on numerous occasions, deliberately indifferent to these injuries. See Compl.

On January 27, 2003, Crum's health record reflects the beginning of a long list of complaints and medical interventions for his chronic headaches. Docket No. 18-12 at 30; Docket No. 18-14 at 30. On January 27, 2003, Crum was prescribed Naproxyn for his headaches. Docket No. 18-12 at 30; Docket No. 18-14 at 30. Two days later, Crum told the medical department that the Naproxyn was providing little relief and his prescription was changed. Docket No. 18-12 at 27; Docket No. 18-14 at 29. On February 4, 2003, Crum continued to complain that he was having headaches on a daily basis, with the pain peaking around noon and at night while he was sleeping. Docket No. 18-12 at 27; Docket No. 18-14 at 28. Crum's prescription was changed again, with instructions to follow up with the medical department in two weeks. Docket No. 18-12 at 28; Docket No. 18-14 at 29.

Crum was seen on February 20, 2003 with no mention of continued headaches. Docket No. 18-12 at 25; Docket No. 18-14 at 27. Instead, Crum stated that he had lower back pain which persisted for the past week. Docket No. 18-12 at 25; Docket No. 18-14 at 27. Crum was still ambulatory and was prescribed Motrin for the pain. Docket No. 18-12 at 25; Docket No. 18-14 at 27. However, on April 14, 2003, Crum was again treated for complaints of chronic headaches which were not relieved by over-the-counter medication. Docket No. 14-25 at 26;  Docket No. 18-12 at 24.

On July 15, 2003, Crum presented to the medical department with complaints of right neck pain which appeared while he was lifting weights and doing pull-ups. Docket No. 18-12 at 24; Docket No. 18-14 at 21. Crum stated that he felt his shoulder pop and then felt

pain which had continued for the past three days. Docket No. 18-12 at 24; Docket No. 18-14 at 21. Upon examination, Crum was able to rotate his arm but unable to lift it above his head, was diagnosed with a shoulder strain, was recommended to apply ice to the shoulder and neck, and was written a prescription for a pain reliever. Docket No. 18-12 at 22, 24; Docket No. 18-14 at 21, 24. Two months later, Crum was seen again for shoulder pain, complaining that his right shoulder was sore after doing any overhead activities and that the pain reliever which had previously been prescribed was not helping. Docket No. 18-12 at 22; Docket No. 18-14 at 21. Crum was diagnosed with a rotator cuff injury, scheduled for an x-ray, and given physical restrictions to refrain from engaging in overhead activity. Docket No. 18-12 at 22; Docket No. 18-14 at 21.

On October 6, 2003, Crum's x-ray was interpreted by Dr. Lawrence Liebman, a radiologist. Docket No. 18-12 at 37. The x-ray showed no evidence of fracture, dislocation, or lesion and the joint spaces were relatively well maintained. Dr. Liebman diagnosed Crum with early degenerative joint disease. Id.

On November 5, 2003, Crum was seen for complaints of left knee pain and swelling that had persisted for approximately one week. Docket No. 18-12 at 20; Docket No. 18-19 at 30. An x-ray was order and Crum was prescribed a pain reliever. Docket No. 18-12 at 20; Docket No. 18-19 at 30. The x-ray was interpreted on November 28 and revealed no evidence of fracture, dislocation, or bony lesion, the joint spaces were relatively well maintained, and there was a small patellar osteophyte, or bony outgrowth. Docket No. 18-12 at 36.

On February 9, 2004, Crum requested an administrative grievance alleging that he had been seeking an evaluation by a physician and not a physician's assistant since his arrival at Ray Brook, he had been unable to see anyone other than a physician's assistant because the facility negligently placed the physician in training and was understaffed, and the prescription medication he was receiving was not relieving his pain. Docket No. 18-8 at 1. While awaiting a response to his grievance, Crum was seen for complaints of right shoulder pain. Docket No. 18-12 at 15, 18; Docket No. 18-14 at 16-17. Upon examination, Crum retained full range of motion and bilateral strength in his shoulder, was diagnosed with bursitis,[3] and was given his first steroid injection. Docket No. 18-12 at 15, 18; Docket No. 18-14 at 16-17.

Crum received a response to his grievance on March 8, 2004 stating that he had been seen on January 30 for lower back and right shoulder pain, he had a long record of receiving prescription medication for his headache, the radiology reports revealed only degenerative changes, his medication had been changed multiple times based on his contentions of poor pain relief, his shoulder pain was recently diagnosed as bursitis and treated with steroid injections, a physician had reviewed all of the charts, and during such review the physician determined that it was "not medically necessary for [Crum] to see a physician . . . ." Docket No. 18-8 at 2. On April 29, 2004, Crum's shoulder was evaluated again and found to have retained full range of motion and strength, still exhibited symptoms

---

[3] Bursitis is the "inflammation of a bursa." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 240 (28th ed. 1994) [hereinafter "DORLAND'S"]. A bursa is "a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." Id. at 238.

5

of bursitis, and Crum received his second steroid injection. Docket No. 18-12 at 15-16; Docket No. 18-14 at 15-16.

On November 1, 2004, Crum began complaining of right knee pain. While Crum had a history of knee problems and had undergone surgery on his meniscus, no trauma or swelling was noted, he retained full range of motion, and he was diagnosed with tendinitis and prescribed pain medication. Docket No. 18-12 at 9; Docket No. 18-14 at 14. Subsequent radiology reports received on November 22, 2004 revealed that Crum's right knee "demonstrate[s] no evidence of acute fracture but did exhibit mild [degenerative joint disease] in the medial and patellofemoral compartments." Docket No. 18-16 at 35.

On March 23, 2005, Crum met with a clinical consultant regarding complaints of back pain. Docket No. 18-12 at 10; Docket No. 18-14 at 13. An x-ray taken on March 22, 2005 confirmed multi-level degenerative disc disease with no acute changes and a recommendation to receive further evaluation via an MRI if radicular signs[4] developed. Docket No. 18-12 at 10; Docket No. 18-14 at 13; Docket No. 18-16 at 1, 33. On April 9, 2005, Crum again complained of lower back pain and was given pain medication. Docket No. 18-12 at 11; Docket No. 18-14 at 12.

On April 22, 2005, defendant Dr. Marini wrote an administrative note in Crum's health record that since Crum's arrival at Ray Brook, (1) there were nine entries concerning complaints of headaches, (2) both of his knees had been x-rayed and showed only degenerative joint changes, (3) his right shoulder had been x-rayed and also showed degenerative join disease and bursitis and was treated with pain medication and steroid

---

[4] Radiculopathy is a "disease of the nerve roots." DORLAND'S 1404.

6

injections, (4) both his knee and shoulder pain appeared after Crum lifted weights, (5) the x-rays on his lower back showed multi-level degenerative disc disease with an MRI recommended only if radicular signs developed, (6) Crum had missed two sick calls, and (7) all of his recent diagnoses and pain were consistent with prior injuries. Docket No. 18-122 at 12-13; Docket No. 18-14 at 10-11.

As a follow-up to Crum's appointment on April 22, on May 24, 2005, Crum received an MRI of his brain and cervical spine. Docket No. 18-12 at 14; Docket No. 18-14 at 9. The MRIs indicated that there were "minor ischemic change[s]" in Crum's brain and that his back showed cervial spondylosis[5] and stenosis[6]. Docket No. 18-16 at 4-5. On June 8, 2005, Marini authored another administrative note in Crum's health record stating that the MRIs performed on May 24 showed (1) diffuse cervical spinal stenosis, (2) bilateral neural foraminal compromise, (3) small herniations at C3-4 and C5-6 and a large herniation at C4-5, (4) extensive cervical disc degeneration, and (4) minor ischemic changes in the basal ganglia requiring referral to another facility for a routine MRI with contrast which was not available at Ray Brook. Docket No. 18-12 at 14; Docket No. 18-14 at 9. On July 8, 2005, Crum received the contrast MRI which indicated that his brain was stable and that he should be referred for a neurology consult "if necessary . . . [for] possibility of very early ALS

---

[5]Cervical spondylosis is a "degenerative joint disease affecting the cervical vertebrae and intervertebral disks, and surrounding ligaments and connective tissue sometimes with pain . . . radiating down the arms as a result of pressure on the nerve roots" DORLAND'S 1564.

[6] Spinal stenosis, also called central and foraminal narrowing, is spinal canal or foramina constriction resulting in back pain caused by pressure being exerted on the nerve roots. MERCK 477.

7

but this is felt to be unlikely . . . ." Docket No. 18-12 at 7; Docket No. 18-14 at 8; Docket No. 18-16 at 2-3.

## B. McKean

On August 11, 2005, Crum was transferred from Ray Brook to the Federal Correctional Institution at McKean, Pennsylvania ("McKean"). Crum's medical record reflected that the chronological record of medical care indicated that using Naproxyn as a pain relief regimen for his shoulder, lower back, and headaches was effective and there was no need to refer Crum to the chronic care clinic for pain management services. Docket No. 18-14 at 3-4. On September 16, 2005, Crum began complaining of chronic shoulder pain despite full range of motion and strength. Docket No. 18-13 at 29-30. Three days later, Crum filed an administrative tort claim alleging gross negligence and deliberate indifference to his serious medical needs.

On September 22, 2005, Crum was evaluated for complaints of shoulder pain and was found to have a full range of motion in the joint despite stiffness and was diagnosed with tendonitis and arthritis but no tears as the symptoms were all idiopathic.[7] Docket No. 18-13 at 28-29. Due to the multiple pain medications Crum was already taking, instead of changing or adding another prescription, Crum was advised on exercises to assist with his range of motion and strength. Id. On October 20, 2005, Crum requested an MRI of his right shoulder, but after consulting the medical record, it was determined that an MRI was

---

[7] Idiopathic symptoms are "self-originated . . . [and] of unknown causation . . . neither sympathetic nor traumatic." DORLAND'S 817-18.

not necessary as all prior radiology results had concluded that Crum suffers from degenerative disc and joint disease without any acute findings and the shoulder examinations had been benign. Docket No. 18-13 at 23-24. The physician agreed and denied the MRI. Id.

On November 12, 2005, Crum filed a second grievance contending that the medical department was failing to record all of his complaints of pain since March 2005, his medical needs had been delayed and intentionally ignored, and he required an MRI of his shoulder. Docket No. 18-9 at 1. On December 6, 2005, Crum received a response to his grievance denying his request for an MRI and claims of negligent medical treatment as he had been evaluated by the Medical Department over twenty times at Ray Brook and seven times since his arrival at McKean four months earlier in addition to receiving multiple x-rays of his shoulder, knees, and chest and MRIs of his head, brain, spine, and knee. Docket No. 18-9 at 2. Crum appealed the denial on December 7, 2005, contending that an MRI was necessary for "a thorough diagnosis [in order to] disclose an obvious need for remedial treatment . . ." and until the MRI was complete, his treatment remained inadequate and defendants were committing malpractice and negligence. Docket No. 18-10 at 1. While awaiting the response to his appeal, Crum was seen by the neurology service on December 12, 2005 and it was concluded that there were "no problems [with his] neck and shoulder," and although Crum complained of lower back pain, he had not needed to use his pain medication. Docket No. 18-13 at 19-20.

On January 11, 2006, Crum's appeal was denied because Crum had been evaluated numerous times, several tests and studies had been conducted including evaluations by

clinical directors who found that additional radiology examinations were not medically indicated at that time, and concluding that Crum was receiving appropriate care. Docket No. 18-10 at 2. A week later, Crum again appealed the denial claiming that none of the prescribed pain medication was effective and that he had been living in discomfort for some time. Docket No. 18-11 at 1.

On January 31, 2006, Crum again presented with complaints of chronic back, neck, and shoulder pain despite his normal gait. Docket No. 18-13 at 11. Crum was diagnosed with arthritis and given Naproxyn. Id. A month later, Crum returned with the same complaints, but upon examination he had full range of motion in his extremities. Docket No. 18-13 at 12. On March 3, 2006, Crum received radiology reports from Walter Reed Army Medical Center concerning (1) his shoulder which showed only degenerative joint changes, and (2) his abdomen which also showed only degenerative changes. Docket No. 18-15 at 27.

On March 14, 2006, Crum was seen for complaints of chronic neck, back, and shoulder pain but again showed a normal gait, full range of motion, and no signs of swelling. Docket No. 18-13 at 9. Crum was told that he would be referred to a physician for further evaluation. Id. Additionally, Crum received a letter denying his administrative tort claim. Docket No. 18-12 at 1. The denial stated that Crum failed to show that there was any negligence or a causal connection between any negligence of defendants and his alleged injuries. Id. Two days later, Crum received a denial of his appeal of his second grievance. Docket No. 18-11 at 2.

On May 9, 2006, Crum was seen for chronic pain in his neck, shoulder, and back. Docket No. 18-13 at 10.  During the examination, Crum denied any numbness or tingling in his arms or hands and no pain or discomfort in his lower legs, he retained full range of motion in his neck and spine and a slightly decreased range of motion in his shoulder, and he was diagnosed with arthritis.  Id.  A week later, Crum went to the Multiple Chronic Care Clinic complaining of pain in his shoulder, back, and knee and was provided with information about medication, diet, exercise, and weight loss.  Docket No. 18-13 at 7-8.

On June 2, 2006, an MRI report from Marian Community Hospital pertaining to Crum's spine and showed moderate degenerative disc disease and spurs in the cervical spine.  Docket No. 18-15 at 24.  Additionally, there was diffuse, mild desiccation of the lumbar discs.  Id. at 25.  Crum continued to complain of pain in June and July, 2006 stating that while he was functioning, pain remained and he was unable to exercise.  Docket No. 18-13 at 3-6.

This motion followed.

## II. Discussion

Crum asserts that defendants were negligent in violation of the FTCA.  Defendants seek dismissal or summary judgment on the ground that the United States and not the individual defendants is the proper party and that Crum has failed to allege a medical malpractice claim under New York State Law as mandated by the FTCA.

11

## A. Legal Standard

Defendants move to dismiss the complaint or, in the alternative, for summary judgment. Fed. R. Civ. P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994). Dismissal is only warranted if it appears beyond a reasonable doubt that the non-moving party can prove no set of facts in support of his or her claim which would be entitled to relief. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact

could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks dismissal or summary judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, __ F.3d __, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)).[8] However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247-48.

Here, evidence outside the complaint has been submitted and considered. Therefore, defendants' motion will be determined as one for summary judgment rather than dismissal.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).

### B. The United States as a Defendant

The FTCA prohibits naming individuals as defendants, providing that the only proper party to sue is the United States.  See Rivera v. United States, 928 F.2d 592, 608 (2d Cir. 1991); Crum v. Dupell, No. 06-CV-512 (FJS/GJD),  2008 WL 902177, at *5 (N.D.N.Y. March

---

[8] Crum has filed two other federal actions since 2006.  See U.S. Party/Case Index (visited Aug. 2, 2007) <http://pacer.uspci.uscourts.gov/cgi-bin/dquery.pl>.

31, 2008). Accordingly, defendants' motion to dismiss the FTCA claims as to the individual defendants should be granted.

### C. Negligence and Medical Malpractice

"Under longstanding principles of sovereign immunity, relief may not be awarded against the United States unless it has waived its immunity." Davis v. United States, 430 F. Supp. 2d 67, 72 (D. Conn. 2006) (citing Dep't of Army v. Blue Fox, Inc., 525 U.S. 255, 260 (1999)). "The FTCA constitutes a limited waiver by the United States of its sovereign immunity." Millares Guiraldes de Tineo v. United States, 137 F.3d 715, 719 (2d Cir. 1998) (internal citations omitted). The FTCA provides that

> An action shall not be instituted . . . against the United States for money damages for . . . personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . .

28 U.S.C. § 2675(a). Thus, the FTCA provides relief for plaintiffs from the United States where it "is liable for torts, including medical malpractice and negligence, committed by its employees in the course of their employment . . . ." Kolt v. United States, No. 94-CV-293, 1998 WL 214826, at *8 (W.D.N.Y. Apr. 24, 1998); see also 28 U.S.C. §§ 1346(b)(1), 2677. Pursuant to the FTCA, a court is required to apply the substantive law of the state where the event occurred. 28 U.S.C. §§ 1346(b)(1), 2674.

The events at issue here occurred at Ray Brook in the State of New York and New York law thus applies. "In order to prevail on a negligence claim, plaintiff must establish three elements: (1) that the defendant owed him a duty of care; (2) that the defendant breached that duty; and (3) that his injury was proximately caused by the breach." Gardner

14

v. United States, 896 F. Supp. 89, 92 (N.D.N.Y. 1995). Additionally, "[t]o establish medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the professional standard of care in the community and (2) that such breach proximately caused the plaintiff's injuries." Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994). Liability attaches "only where injuries result from a lack of the requisite knowledge and skill, a failure to exercise reasonable care or a failure to use the defendant's best judgment." Kolt, 1998 WL 214826, at *8. " Whereas medical malpractice entails a departure from professional standards of care, '[n]egligence, broadly speaking, is conduct that falls below the standard of what a reasonably prudent person would do under similar circumstances judged at the time of the conduct at issue.'" Id. (citing Fane v. Zimmer, Inc., 927 F.2d 124, 130 n.3 (2d Cir. 1991)).

In this case, Crum cannot establish that employees of the United States were either negligent or performed medical malpractice as they did not breach a reasonable or professional standard of care and were not the proximate cause for the injuries. "The duty of care owed by the united States, through the Bureau of Prisons, is provided by 18 U.S.C. § 4042, and requires the exercise of ordinary diligence to keep prisoners safe and free from harm. The United States does not guarantee the safety of a prisoner. Jones v. United States, 534 F.2d 53, 54 (5th Cir. 1976) (citations omitted).

As the record described above at length demonstrates, Crum was seen over twenty times by medical personnel while at Ray Brook. Docket No. 18-12 at 7-37; Docket No. 18-14 at 7-30; Docket No. 18-16 at 1-4, 33-35. Additionally, he received at least four x-rays and three MRIs. See, e.g., Docket No. 18-12 at 12; Docket No. 18-14 at 11. All of these

15

tests demonstrated that Crum was suffering from degenerative changes and not from acute disease.  Id.  Moreover, the record shows that the medical staff prescribed multiple different pain medications in an attempt to alleviate Crum's chronic pain.  Docket No. 18-12 at 7-37; Docket No. 18-14 at 7-30; Docket No. 18-16 at 1-4, 33-35.  This course of treatment was consistent with the professional standards of care as it was the same course of action taken at McKean.  Moreover, the radiology results from Crum's numerous tests were interpreted by individuals at various facilities, both public and private, and all produced similar, if not identical, impressions and recommendations.  Furthermore, on multiple occasions, Crum stated that his pain regimen was either sufficient or that despite his pain, it was not sufficiently severe to necessitate taking the medication.  Docket No. 18-13 at 19-20; Docket No. 18-14 at 3-4.  Thus, despite Crum's conclusory allegations that he did not receive treatment that met the professional standards of care, the record indicates otherwise.  See Docket No. 23 ("[I]n light of defendants' documentary evidence to the contrary, Crum's conclusory allegations that defendants denied him medical treatment fail to raise a genuine issue of material fact as to defendants' deliberate indifference.").

Therefore, the motion of the United States on this ground should be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion (Docket No. 28) be:

    1. **GRANTED** as to the individual defendants and the case be terminated as to them; and

2. **GRANTED** as to the United States and judgment be entered in favor of the United States in all respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: August 27, 2008
      Albany, New York

_David R. Homer_
United States Magistrate Judge